NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, COMMERCE STREET INVESTMENT, LLC, PRU ALPHA FIXED INCOME OPPORTUNITY MASTER FUND I, L.P., PRUDENTIAL RETIREMENT INSURANCE AND ANNUITY COMPANY, AND PRUDENTIAL TRUST COMPANY, | Civil Action No. 12-5854 (WJM) |
| **Plaintiffs,** | |
| v. | |
| BARCLAYS BANK PLC, BARCLAYS CAPITAL INC., BCAP LLC, SECURITIZED ASSET BACKED RECEIVABLES LLC, AND SUTTON FUNDING, LLC, | **REPORT & RECOMMENDATION** |
| **Defendants.** | |

FALK, U.S.M.J.

Plaintiffs—the Prudential Insurance Company of America and a number of Prudential related entities—originally filed this action in New Jersey state court, asserting fraud and other state law claims against several financial institutions arising out of the purchase of more than $200 million in residential mortgage backed securities ("RMBS"). Defendants removed the action to this Court. Plaintiffs now move to remand. The motion is opposed. The Honorable William J. Martini, U.S.D.J. has referred the motion to the Undersigned. No argument has been

heard.  Fed. R. Civ. P. 78(b).  For the reasons that follow, it is respectfully recommended that Plaintiffs' motion be **GRANTED**.

## BACKGROUND

Plaintiffs are the Prudential Insurance Company of America; Commerce Street Investments, LLC; Pru Alpha Fixed Income Opportunity Master Fund I, L.P.; Prudential Retirement Insurance and Annuity Company ("PRIAC"); and Prudential Trust Company. Defendants are Barclays Bank, PLC; Barclays Capital, Inc.; BCAP, LLC; Securitized Assets Backed Receivables LLC; and Sutton Funding LLC (collectively "Defendants").

From 2005 through 2007, Plaintiffs purchased more than $200 million in RMBS spread across 15 separate securitizations (the "Certificates") from Defendants.  Plaintiffs allege that the registration statements, prospectuses, prospectus supplements, term sheets and other written materials used by Defendants to solicit the purchases (the "Offering Materials") contain numerous material misrepresentations and omissions regarding the underwriting guidelines followed by the originators of the underlying mortgage loans, as well as material misrepresentations regarding the risk profile and credit quality of the loans.  As a result, Plaintiffs claim that the default rates on the mortgages have soared and the value of the certificates have plummeted.

This action was commenced in state court on August 21, 2012.  The 133 page, 420 paragraph Complaint contains state law claims for fraud, aiding and abetting fraud, negligent misrepresentation, and violations of the New Jersey civil RICO statute.  On September 18, 2012, Defendants removed the case to this Court on two grounds: (1) that the case is "related-to" pending bankruptcy proceedings; and (2) diversity of citizenship.  On October 12, 2012, Plaintiffs filed a motion to remand.  On December 12, 2012, while this motion was still being

briefed, Senior District Judge William H. Walls granted a motion to remand in a related Prudential case, rejecting the same jurisdictional bankruptcy arguments advanced here.

## **DISCUSSION**

This purely state law case between non-bankrupt parties has no business in federal court, district or bankruptcy.   Excellent, creative lawyers and high stakes are the genesis of the removal-remand battle underway.

First, Defendants' "related to" bankruptcy attempt at jurisdiction is doomed on multiple levels.  None of the parties is in bankruptcy.  The case has nothing to do with a bankruptcy.  The fact that some, but certainly not all, of the bonds that are involved in three separate, distant bankruptcy proceedings on the east and west coasts does not make this case "related to" bankruptcy, at least not more than hypertechnically.

Second, even if there was "related to" bankruptcy jurisdiction, the Court would be required not to exercise jurisdiction by the mandatory abstention provisions of the statute.  If the Court somehow ignored mandatory abstention, it would exercise permissive abstention pursuant to the statute.

Finally, assuming all of the above was ignored, the "related to" bankruptcy removal statute, 28 U.S.C. § 1452, gives the Court expansive discretion to remand the case on any equitable ground.   And a discretionary remand on this ground is not even subject to appeal. Needless to say, the case is brimming with equitable grounds calling for remand.   Were it necessary, the Court would remand on this statutory basis.

The diversity jurisdiction argument is just as weak.  There is no diversity jurisdiction and no way around it.  The attempt to say that an independent corporation that purchased at least $20 million dollars of bad bonds was "fraudulently joined" is not a serious argument.

In simple terms, the case belongs in state court.

## A.  <u>Removal Generally</u>

The federal removal statute provides that "[e]xcept as otherwise provided by Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed . . . to the district court of the United States for the district and division embracing the place where such action is pending."  28 U.S.C. § 1441(a).  "[T]he party asserting federal jurisdiction in a removal case bears the burden of showing, at all stages of the litigation, that the case is properly before the federal court."  <u>Frederico v. Home Depot</u>, 507 F.3d 188, 193 (3d Cir. 2007).  Removal is strictly construed and all doubts are resolved in favor of remand.  <u>See</u> <u>Samuel-Bassett v. Kia Motors Am., Inc.</u>, 357 F.3d 392, 396 (3d Cir. 2004).

## B.  <u>"Related To" Bankruptcy Jurisdiction</u>

Defendants first basis for removal is "related to" bankruptcy jurisdiction.  Section 1452(a) of the Bankruptcy Code allows for the removal from state court of any claims that arise under 28 U.S.C. § 1334(b), which confers on district courts "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or *related to* cases under title 11."  <u>Id.</u> (emphasis added).

A state court proceeding is deemed related to a bankruptcy proceeding if the outcome "could conceivably have any effect on the estate being administered in bankruptcy."  <u>Pacor, Inc. v. Higgins</u>, 743 F.2d 984 (3d Cir. 1984), <u>overruled on other grounds by</u> <u>Things Remembered, Inc. v. Petrarca</u>, 516 U.S. 124 (1995).  Thus, under certain limited circumstances, a civil action can be related to bankruptcy if the outcome could alter "a debtor's rights, liabilities, [or] options . . . or if it in any way impacts . . . the handling of a bankrupt estate."  <u>Id.</u>  While seemingly broad, there is a limit to what is "conceivable," <u>Celotex Corp. v. Edwards</u>, 514 U.S. 300, 308 (1995),

and more than the "mere potential" for a civil proceeding to "impact upon [a] debtor's estate" is required in order to create "related to" jurisdiction.  Steel Workers Pension Tr. v. Citigroup, Inc., 295 B.R. 747, 753 (E.D. Pa. 2003).  Moreover, if a debtor's liability cannot be fixed in the supposedly related civil case and a second proceeding is required, then "related to" jurisdiction does not exist.  See Steel Workers Pension Tr., 295 B.R. at 753; see also Pacor, 743 F.2d at 994.

Defendants argue there is "related to" bankruptcy jurisdiction in this case based on certain indemnification agreements they have with three bankrupt, non-party companies— identified as Fremont, New Century, and Aegis—that Defendants contend originated some of the loans underlying "nine of the fifteen RMBS" certificates at issue.[1] [2] According to Defendants, they acquired some of the loans underlying the RMBS Certificates from the Bankrupt Originators and, in doing so, secured broad indemnification agreements from the Originators that would protect Defendants against any losses due to misstatements concerning the mortgage loans.  For example, Defendants quote an indemnification clause in an agreement with one of the Bankrupt Originators, Fremont, as follows:

> [Fremont] shall indemnify and hold harmless [Barclays] against any and all losses, claims, damages, penalties, fines, forfeitures or liabilities . . . to which Barclays may become subject . . . to the extent that such losses, claims, damages, penalties and fines, forfeitures or liabilities (or actions in respect thereof) arise out of or are based upon any material fact contained in the [offering documents] . . . to the extent that such untrue statement . . . relates to information set forth in the Indemnifying Party Information and [Fremont] shall in each case reimburse [Barclays] for any legal or

---

[1] While claiming the Bankrupt Originators originated "substantially all" of the mortgage loans underlying "nine of the fifteen" offerings, that still leaves six offerings unaccounted for, and Defendants do not identify who originated the loans underlying those six offerings.  This raises the question of how any claims that relate to the other six certificates could ever be "related to" a bankruptcy of any type.

[2]  The bankruptcy proceedings are: In re Fremont, No. 08-13421-EAS (C.D. Cal.); In re Aegis, No. 07-1119-BLS (D. Del.); and In re New Century, No. 07-10419-KJC (D. Del.).

> other costs, fees, or expenses reasonably incurred . . . in connection
> with investigating or defending any such . . . action.

Declaration of Matthew L. Craner, Esq. ("Craner Decl.") at Ex. D at 3.[3]

Defendants contend the filing of Plaintiffs' Complaint, which alleges misstatements in, among other things, the Offering Materials, triggers the indemnification agreements; could "conceivably" impact the originators' bankruptcy estates; and creates "related to" bankruptcy jurisdiction.  The Court disagrees.

### 1.    Defendants Have Failed to Establish An Automatic Right to Indemnification[4]

A defendant's claim for indemnity against a bankrupt debtor—such as Defendants' claim against the Originators here—only creates "related to" jurisdiction if the defendant can establish: (1) the liability of the bankrupt party is "automatically triggered when the purported related action against the party seeking indemnification is begun"; and (2) "a later lawsuit against the debtor . . . [is not] a prerequisite to a finding of indemnification."  Steel Workers Pension Tr., 295 B.R. at 753.  Defendants fail to establish these requirements.

### (i)    Lack of Notice

The indemnification agreements at issue contain language that requires that Defendants promptly provide notice of the commencement of this action to the Bankrupt Originators in order to trigger any potential indemnification rights.  See, e.g., Craner Decl., Ex. C § 3.2.  Defendants

---

[3]  Defendants claim the various indemnification agreements with the Originators are "substantially identical."  The agreements are attached to the Craner Declaration as Exhibits D-G.  It should be noted that the indemnification agreements and documents referred to therein are longer and more complex and could provide ample fodder for disputes over their application and scope.

[4]  This Court has a visceral belief that this action will not actually impact any bankruptcy estate -- in the real world.  Similarly, the Court does not believe the terms "conceivably impact" are really as sweeping as the parties seem to assume.  These may be issues for another day.  For now, the Court will confine itself to the arguments advanced by the parties.

have not argued, nor put any information before the Court, that suggests they have notified the Bankrupt Originators of the pendency of this action.  Indeed, Defendants have not filed a proof of claim asserting their indemnification rights in any of the pending bankruptcy proceedings— and the time to do has now passed.  By failing to provide the Court with proof that they have provided notice to the Bankruptcy Originators, Defendants have failed to establish that they are entitled to automatic indemnification under the agreements.  Cf. In re Allegheny Health, Educ. & Research Found., 383 F.3d 169, 175 n.7 (3d Cir. 2004) (noting that "related to" jurisdiction was established when contract required indemnification and defendant had "*already made demand on [debtor] to defend it*" (emphasis added)).[5]

> ### (ii)   <u>Need for a Second Proceeding</u>

The Third Circuit has explained that there is no "related to" jurisdiction when the defendant's right to indemnification is an issue that still must be established in a second lawsuit involving the bankrupt indemnitors.   See Pacor, 743 F.2d at 994.   Stated differently, a supposedly "related to" civil proceeding (here, this lawsuit) is a "mere precursor to the potential third-party claim for indemnification," and not "related to" any bankruptcy proceeding, if the indemnification rights at issue are contingent upon the outcome of a second proceeding involving the debtor.  Id.

---

[5] The lengthy, single-spaced agreements are complex and do appear to contain certain provisions that could be read to excuse the notice requirement so long as the originators are not "materially prejudiced."  Craner Decl., Ex. C § 3.2.  Of course, whether any party has been "materially prejudiced" would require a second proceeding involving the Originators.  Not to mention it raises the question of whether the Originators, who are *three different companies*, would all take the same position on the prejudice question.  This is further proof that any indemnification rights that could exist are not automatic.

Here, Defendants contend that "*because Prudential's claims allege untrue statements made by the Bankrupt Originators*,"[6] their indemnification rights are automatically triggered under the relevant agreements.  The problem with this argument is that Prudential *alleges no such thing*.

This case is about Plaintiffs' allegations about <u>*Defendants'*</u> conduct.  This includes the claim that Defendants have made material misrepresentations, not the Bankrupt Originators.  The case simply has nothing to do with the conduct of the Bankrupt Originators; Plaintiffs have not pleaded any claims against the Originators and have not named them as parties in this lawsuit.  While Defendants may claim that ultimate responsibility for certain misstatements rests with the Bankrupt Originators, it is not an issue that will be decided in this case.  Instead, a second proceeding, involving the Originators, will be needed for such a determination to be made.  That renders Plaintiffs' claims against Defendants at best "a precursor" to a second dispute between Defendants and the Bankrupt Originators over coverage under the indemnification agreements.  It is therefore clear that a another action is required in order for Defendants to establish any indemnification rights vis-à-vis the Bankrupt Originators.  This was the precise conclusion reached by Senior District Judge Walls in a related case, <u>Prudential v. J.P. Morgan, et al.</u>, No. 12-3489, 2012 WL 6771977 (D.N.J. Dec. 20, 2012), just over a month ago.

Like this case, <u>J.P. Morgan</u> involved Prudential's claims related to RMBS sold by a bank and underwritten by the same Bankrupt Originators—*viz*., Aegis, New Century and Fremont.  In <u>J.P.</u>, as here, the defendants argued that the misstatements Prudential complained of were contained in offering materials, and that the defendants were entitled to indemnification and reimbursement of legal fees pursuant to the same indemnification agreements at issue in this

---

[6] (<u>See</u> Defs.' Br. 20 (emphases added).)

case.   When confronted with the same agreements now before this Court (and the same arguments), Judge Walls rejected the notion that indemnification was automatic and provided a sufficient basis for "related to" bankruptcy jurisdiction:

> The suit before this Court involves alleged untrue statement by *Defendants*; it does not involve alleged untrue statements by the *Bankrupt Originators*.  While Defendants may wish to claim that the fraud on behalf of the Bankrupt Originators underlies the Plaintiff's Complaint, a lawsuit establishing the Bankrupt Originators' liability is not before this Court.  A separate suit would be required to establish whether the Bankrupt Originators' indemnification clause accrued "insofar as such … liabilities . . . arise out of or are based upon any untrue statement or alleged untrue statement of material fact contained in . . . the Prospectus Supplement.

Prudential, 2012 WL 6771977, at *4.

Judge Walls further explained that even if the fraud ultimately *did* originate with the bankrupt entities, as defendants (in both cases) claim, it still would not trigger automatic indemnification sufficient to support related-to jurisdiction:

> . . . [E]ven if the fraud originated with the manufacturers . . .  the indemnification agreements did not accrue upon the filing of the present suit.  Like in Pacor, this suit does not establish 'automatic liability.'   As such, the indemnification clauses do not confer "related to" jurisdiction in this case.

Id. at *5.

This Court agrees with Judge Walls's analysis.  In short, there are determinations that must be made in a second proceeding with respect to allocation of any blame between Defendants and the Originators and any rights to indemnification.  Therefore, Defendants are not entitled to

automatic indemnification under the agreements, and there is no "related to" bankruptcy jurisdiction in this case.[7]

2.   **Defendants' Unasserted Indemnification Claims Could Not "Conceivably" Impact the Bankruptcy Estates**

Defendants apparently have not sued or even notified the Bankrupt Originators of their supposed indemnification claims.  Defendants also concede that they have not filed any proofs of claim in any of the bankruptcy cases, despite expiration of the time for submitting such claims. This is noteworthy since a creditor seeking to recover must file a proof of claim before the court-imposed bar date.  See, e.g., Chemtron Corp. v. Jones, 72 F.3d 341, 346 (3d Cir. 1995); Allstate Ins. Co. v. Merrill Lynch & Co., 11-2280, 2011 U.S. Dist. LEXIS 124333, at *6-9 (S.D.N.Y. Aug. 15, 2011) (rejecting "related to" bankruptcy jurisdiction in RMBS case when defendants did not file timely proofs of claim in related bankruptcy).  In addition, bankruptcy plans have *already been confirmed* with respect to, at least, two of the three originators: Aegis and New Century.  By failing to provide notice and file proofs of claims, Defendants have foreclosed the already extremely remote chance this case could impact a bankruptcy proceeding.

Defendants desperately claim that they could try and submit proofs of claim after the bar date.  However, the same argument was recently rejected in an analogous case, Sealink Funding Ltd. v. Bear Stearns & Co., No. 12-1397, 2012 WL 4794450 (S.D.N.Y. Oct. 9, 2012).  In

---

[7] Defendants attempt to rely on In re Allegheny Health, 383 F.3d 169 (3d Cir. 2004), and Belcufine v. Aloe, 112 F.3d 633 (3d Cir. 1997), to avoid this result, but District Judge Walls has already explained why these cases do not apply.  See J.P. Morgan, 2012 WL 6771977, at *5.  In short, Belcufine arose under dramatically different facts and involved employee indemnification claims against corporate managers that conceivably could have had a direct impact on a bankrupt estate.  Id. at 636.  In re Allegheny also involved a circumstance where resolution of the suit could have established liability of the bankrupt entity.  These case are not helpful because, here, there would still need to be a second proceeding to determine whether the Bankrupt Originators were responsible for the alleged fraud.

Sealink, the defendants attempted to remove state law fraud claims associated with RMBS purchases to federal court relying on "related to" bankruptcy jurisdiction. Id. at *1. However, there, as here, the defendants had not filed any proofs of claim in the "related" bankruptcies and the claims bar dates had passed. The court explained how failing to submit proofs of claim eliminated any "conceivable" chance that the bankruptcy estate could be impacted by the indemnification claims, thereby eliminating the possibility of "related to" jurisdiction:

> Defendants' related-to jurisdictional assertion is premised on the proposition that their potential indemnification claims and recovery against Bankrupt Originators could conceivably affect those debtors' estates. However, the indemnification claims against the Bankrupt Originators cannot affect the bankruptcy estate or the allocation of property to creditors unless Defendants are in a position to receive actual distributions on account of allowed indemnification claims. There is no prospect of such an allowance and distribution with respect to unsecured claims that are neither filed in a bankruptcy proceeding or scheduled as undisputed by a Chapter 11 debtor in possession.
>
> A remote chance that a late-filed claim might be allowed, without evidence of pursuit of such claims or any demonstration that the claims, if allowed, would have a financial impact on the estate, is too remote and speculative to support the exercise of "related to" jurisdiction of this non-core state law fraud claim.

Id. at *3-5.

The same is true here. Defendants cannot create "related to" jurisdiction simply by *referring* to the mere existence of a bankruptcy proceeding. Some actual affirmative step is required in order for Defendants' indemnification claims to have a "conceivable" impact on a debtor's estate. Defendants' inaction in the face of their speculative indemnification claims as to only some of the Plaintiffs' claims conclusively demonstrates that this case has no "conceivable" impact on any bankrupt estates.

**C.**     <u>**Abstention**</u>

**1.**     <u>**Mandatory Abstention**</u>

Even if it could be conceived that there was somehow "related to" bankruptcy jurisdiction in this case, remand would still be appropriate.  28 U.S.C. § 1334(c)(2) provides that a district court must abstain from proceeding with a "related to" bankruptcy case in the following circumstances:

> Upon timely motion of a party in a proceeding based upon a state law claim or state law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court *shall abstain* from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a state forum of appropriate jurisdiction.

In order for mandatory abstention to apply, it must be shown that:  (1) the motion to abstain was timely; (2) the proceeding is based on state law claim or cause of action; (3) the action does not "arise in" a bankruptcy case or "arise under" title 11; (4) federal courts would not have jurisdiction over the case but for its relation to a bankruptcy case; (5) the action "is commenced" in a state forum of appropriate jurisdiction; and (6) the action can be "timely adjudicated in a state forum of appropriate jurisdiction.  <u>See generally</u> <u>Stoe v. Flaherty</u>, 436 F.3d 209, 213 (3d Cir. 2006).

Defendants effectively challenge only factor 6—*i.e.*, whether the action can be "timely adjudicated" in state court.[8]  Defendants argue that this case cannot be "timely adjudicated" in

---

[8] Defendants also technically dispute factor 4, claiming that the Court also has diversity jurisdiction.  However, as is explained *infra*, this is incorrect; complete diversity is lacking in this case.  As for the remaining factors, they are undisputed and easily satisfied: the motion to abstain was timely; the Complaint contains only state law claims; defendants do not allege "arising under" or "arising in" bankruptcy jurisdiction; and the action was originally commenced in state court.

New Jersey state because the Essex County state courts have a heavy caseload.  Plaintiffs counter

by referring to CJRA reports detailing this Court's heavy civil and criminal docket and by citing

to statistics published by the New Jersey Superior Court suggesting that civil actions in state

court are proceeding expeditiously.

Although the parties seek to compare the respective workloads of the New Jersey state

and federal courts, such a statistical comparison is misguided and irrelevant.  Rather, as the Third

Circuit has explained, the pertinent inquiry is simply whether this case could be "timely

adjudicated" in state court.  See, e.g., In re Exide Techs., 544 F.3d 196, 218 n.14 (3d Cir. 2008)

("The question is not whether the action would be more timely adjudicated in the bankruptcy

court than in state court, but rather, whether the action can be timely adjudicated in state

court.").[9]  The answer to that question is obviously yes.

There is no reason to assume that the state court would not proceed with this case in an

expeditious way.  In fact, contrary to Defendants' suggestion about the Essex County Superior

Courts, a related case that is already pending in Essex County, *Prudential Ins. Co. v. Morgan

Stanley*, No. ESX-L-3080-12 (N.J. Sup. Ct. Essex Cnty., filed Apr. 25, 2012), is proceeding

efficiently.   The court has conducted several conferences, decided a number of discovery

motions, and issued a proposed case management order.  See Declaration of Robin H. Rome,

Esq., Exs. 17-18.[10]  There is no reason that this case would be any different.  This is more than

---

[9] Even if some type of statistical comparison was appropriate, there does not appear to be a
substantial difference between the relevant adjudication times.  See, e.g., Calascibetta v. J.H.
Cohn LLP, No. 11-1743, 2011 WL 2224179, at *2 (D.N.J. June 6, 2011) (finding mandatory
abstention and noting "[a]lthough Defendant cites to differences in case disposition times
between this Court and New Jersey state courts in its opposition, this paints only a generalized
picture. This Court does not see any overwhelming or substantial difference between the two.").

[10]  In addition to the Morgan Stanley case there are at least two additional, related Prudential
cases pending in Essex County Superior Court, Prudential v. RBS Fin. Prods., L-6206-12, and
the J.P. Morgan case recently remanded by District Judge Walls.  In light of the fact three related

enough to satisfy the "timely adjudication" requirement.  Cf. In re Exide Techs., 544 F.3d at 218 n.14.  In fact, if anything is delaying the state court from proceeding expeditiously with this case, it is Defendants' ill-fated removal to federal court.

Because this case can be timely adjudicated in state court, all of the factors for mandatory abstention are satisfied.  Therefore, even if there was "related to" jurisdiction, it would still be appropriate to remand this case under the mandatory abstention principles of 28 U.S.C. § 1334(c)(2).[11]

## 2.   **Permissive Abstention**

The Court has already found there is no "related to" bankruptcy jurisdiction in this case and that, even if there was, abstention is mandatory.  Yet, if for some reason *both* of these conclusions are incorrect, the case should still be remanded pursuant to the *permissive* abstention provisions of 28 U.S.C. 1334(c)(1).  Section 1334(c)(1) provides that:

> Nothing in this section prevents a district court in the interest of justice, or in the interest of comity with state courts or respect for state law, from abstaining from hearing a particular proceeding arising under title 11, or arising in or related to a case under title 11.

cases are now proceeding in state court, it is artificial to dispute whether this case will be "timely adjudicated" in state court.

[11]   The parties expend much effort fighting over which party technically bears the burden of establishing that a timely adjudication can be had in state court.  Relying on dicta in Stoe, Defendants contend it is Plaintiffs' burden.  See 436 F.3d at 213 n.5.  Plaintiffs counter with ample authority that suggests that the burden is actually on Defendants.  See, e.g., Calascibetta, 2011 WL 2224179, at *2 (Chesler, J.) (placing burden on defendants); Allstate Ins. Co. v. Ace Sec. Corp., No. 11-1914, 2011 WL 3628852, at *7-9 (S.D.N.Y. Aug. 17, 2011) (same); see also Woodbridge Center Property, LLC v. Woodbridge Pizza, LLC, No. 09-2050, 2009 WL 2096058, at *3 (D.N.J. July 14, 2009) (Debevoise, J.) (placing burden on defendant to establish element of mandatory abstention).  The Court considers this a largely esoteric dispute in a case where it is obvious that a timely adjudication can be had in state court no matter which party technically bears the burden of proof.  In all events, even if Plaintiffs bear the burden, it has clearly been met in this case.

Id.

Factors courts consider when evaluating permissive abstention include, among others: (1) the effect on the administration of the bankruptcy estate; (2) the extent to which state law issues predominate; (3) the difficulty or unsettled nature of the applicable state law; (4) comity; and (5) the degree of relatedness of the bankruptcy proceeding.  See In re Donington, Karcher, Salmond, Ronan & Rainone, 194 B.R. 750, 760 (D.N.J. 1996).

In the J.P. case discussed earlier, Judge Walls found that permissive abstention was appropriate, regardless of whether there was "related to" jurisdiction.  This Court wholeheartedly agrees with Judge Walls—all of the relevant factors suggest that, while not necessary, permissive abstention would be appropriate in this case.

First, there is no reason keeping this case in federal court would benefit the efficient administration of a bankruptcy estate.  The bankruptcy proceedings involving the Bankrupt Originators are not pending in New Jersey but rather in California and Delaware.  Thus, keeping this case in federal court in New Jersey would not benefit either bankruptcy proceeding, especially since no party has suggested that this case should be transferred to either of the federal courts where the bankruptcies are actually pending.  Thus, in terms of the impact on the bankruptcy estates, it would actually make absolutely no difference if this case was pending in state or federal court in New Jersey.[12]

---

[12] This begs a series of questions, none of which are discussed in the papers.  For example, Defendants lump the Bankrupt Originators together and speak broadly of "related to" bankruptcy jurisdiction.  But "related to" which bankruptcy?  There are three different companies and three different bankruptcies pending in three different courts.  Does this case relate to one of those proceedings more than another?  To all of them?  Moreover, the Bankrupt Originators are apparently only involved in 9 of the 15 certificates at issue in the Complaint.  What about the other six?  Should Plaintiffs' claims relating to those six certificates be pushed into a bankruptcy court on the other side of the country for no apparent reason?  Would a transfer of this case to a bankruptcy court even be sought?  If so, to which one?  These types of questions are reasonable

Second, this case involves only state law claims.

Third and fourth, comity and state law considerations favor abstention.  This case involves a state law civil RICO claim, which materially differs from the federal statute.  See State of New Jersey v. Ball, 141 N.J. 142, 160-62 (1995) (comparing differences between federal and state RICO statutes).  While federal courts are capable of deciding issues of state law and often do, "decisions of state law should be avoided [by a federal court] . . . as a matter of comity" when possible.  See United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966).  Since this case may raise unique issues of state law (e.g., standing of certain Plaintiffs to bring RICO claims), it is more appropriate for this case to proceed in state court.

Finally, there is no relationship whatsoever between this case and any bankruptcy proceedings.  The bankruptcy proceedings are in California and Delaware and do not involve the parties to this case.  Moreover, Defendants have not filed proofs of claims in those bankruptcies, which underscores that this case is not related to a pending bankruptcy case.

**D.**     **The Case Should Be Remanded On Discretionary Equitable Grounds Pursuant to 28 U.S.C. § 1452(b)**

Put aside the previous reasons why the case should be remanded.  The express language of the bankruptcy "related to" removal statute, 28 U.S.C. § 1452, relied on by Defendants, permits the Court to remand the case on any equitable ground.  See 28 U.S.C. § 1452(b).  The wording is almost unlimited, and the decision to remand on equitable grounds is non-appealable. Id.

---

to ask when Defendants have lumped the originators and bankruptcies together and simply attempt to make *something* stick.  These questions are posed only to show that this case is different than, and raises more questions than, the more common occurrence of a civil case, a single related bankruptcy proceeding, and the somewhat common practice of transferring "related to" civil proceedings to the district where the Title 11 case is pending.

The decision to remand on equitable grounds is discretionary.  See, e.g., In re McCarthy, 230 B.R. 414, 419 (9th Cir. 1999) ("[The] 'any equitable ground' remand standard is an unusually broad grant of authority.  It subsumes and reaches beyond all of the reasons for remand under non-bankruptcy removal statutes."); In re Raymark Indus., Inc., 238 B.R. 295, 299 (E.D. Pa. 1999) ("Section 1452(b) invites remand on 'any equitable ground' and grants the court broad discretion to rule on the propriety of litigating a matter in federal court."); see also 1 Collier on Bankruptcy § 3.07[5] (noting section 1452(b) "gives broad discretion to remand . . . on 'any equitable ground' . . . a term that includes almost any ground believed appropriate by the court").

Even if removal jurisdiction existed on "related to" bankruptcy grounds, equitable remand is more than appropriate here.  The reasons are many and need only be listed: neither of the parties is in bankruptcy; the case is based purely on state law; many of the underlying loan issuers are not in bankruptcy; there are three different bankruptcy proceedings 3,000 miles apart; there are nearly identical cases already pending in the New Jersey state court where this case will be remanded to; proceeding in federal court would cause great duplication of judicial resources; if not remanded, some type of severance of the claims in this case would be necessary; and, without remand, plaintiffs would be forced to litigate their claims in various forums around the country.  There are additional reasons, but the bottom line is the same.  It would be unfair and terribly inconvenient to Plaintiffs and others to keep this case in federal court.  It should be promptly remanded.

**E.**      **No Diversity Jurisdiction**

Plaintiff PRIAC is a citizen of Connecticut, and Defendant Barclays Capital, Inc. is also a Connecticut citizen.  Therefore, on the face of the Complaint, there is no diversity jurisdiction in

this case.  See Wis. Dep't of Corr. v. Schacht, 524 U.S. 381, 389 (1994) (diversity jurisdiction is present "only if there is no plaintiff and no defendant who are citizens of the same state").  Nevertheless, Defendants still contend that diversity jurisdiction is present because PRIAC has supposedly been fraudulently joined as a *Plaintiff*; lacks standing to sue; and should be disregarded for purposes of determining diversity.

Although there is no question that PRIAC is the owner of more than $20 million in RMBS pleaded in the Complaint, Defendants contend PRIAC is somehow not a proper plaintiff in this case.  Defendants strained theory is that another Prudential company—Prudential Investment Management, Inc. ("PIM"); PRIAC's investment advisor)—purchased the Certificates on PRIAC's behalf, and therefore, PIM is the company that relied on any fraudulent misstatements.  According to Defendants, this means PRIAC lacks standing to bring its fraud and RICO claims.

Plaintiffs counter that while PIM may have been involved in the purchase of the securities, PRIAC is still the proper Plaintiff because it *owns* the Certificates, and because PIM was acting solely as PRIAC's agent during the purchase process.  According to Plaintiffs, the relevant case law *requires* that PRIAC, the owner of the securities, bring this fraud case, and that it is actually PIM (a passive investment advisor) that lacks standing to sue as a matter of law.

The fact is Defendants can remain in federal court only if they can establish that PRIAC was intentionally and fraudulently joined for the purpose of destroying diversity.  See Batoff v. State Farm Ins. Co., 977 F.2d 848, 851 (3d Cir. 1992); Abels v. State Farm Fire & Cas. Co., 770 F.2d 26, 29 (3d Cir. 1985).  The burden of establishing fraudulent joinder is heavy.  Batoff, 977 F.2d at 851 (quotation omitted).  All factual allegations in the complaint are assumed to be true, Steel Valley Auth. v. Union Signal & Switch Div., 809 F.2d 1006, 1010 (3d Cir. 1987), and

joinder is considered fraudulent *only* when "there is *no* reasonable basis in fact or colorable ground supporting the claim" in dispute.  Batoff, 977 F.2d at 851.  For a claim to lack a colorable basis, "it must be wholly insubstantial and frivolous."  Id. at 852.

Fraudulent joinder is not meant to substitute for a merits analysis.  See In re Briscoe, 448 F.3d 201, 219 (3d Cir. 2006) ("courts must be careful not step from the threshold jurisdictional issue into a decision on the merits").  Indeed, "the inquiry into the validity of the complaint triggered by a motion to dismiss under Rule 12(b)(6) is *more searching* than that permissible when a party makes a claim of fraudulent joinder."  Batoff, 977 F.2d at 852 (emphasis added).  Therefore, "[i]f there is even a possibility that a state court would find that the complaint states a cause of action . . .  the federal court must find that joinder was proper and remand the case to state court."  Boyer, 913 F.2d at 111 (quotation omitted).[13]

Defendants woefully fail to establish that PRIAC was fraudulently joined in this case.  Fraudulent joinder is about frivolousness.  It is a doctrine that is meant to address clearly

---

[13] There is some question as to whether the Court should even *consider* Defendants' fraudulent joinder argument.  The doctrine of fraudulent joinder is traditionally something that applies to the allegedly improper joinder of *defendants* in an effort to defeat diversity jurisdiction.  The Third Circuit has never approved extending the doctrine to attack the joinder of *Plaintiffs*, and some courts refuse to do so.  See, e.g., Reeves v. Pfizer, Inc., --- F. Supp. 2d ---, 2012 WL 2995834, at *2 (S.D. Ill. July 23, 2012) ("this Court finds that extending the doctrine of fraudulent joinder to joinder of plaintiffs would be, like fraudulent misjoinder, a massive increase to this Court's jurisdiction. Defendant's argument has not convinced the Court that the fraudulent joinder doctrine is or should be so expanded."); Johnston Indus. Inc. v. Milliken & Co., 45 F. Supp. 2d 1308, 1312 (M.D. Ala. 1999) (rejecting argument that named plaintiff "lacked standing"; rejecting the concept of plaintiff-focused fraudulent joinder; and finding that "the application of the doctrine of fraudulent joinder of a defendant does not extend to include the alleged fraudulent joinder of a plaintiff").  This makes some sense, especially here, where the alleged improper joinder is based on a pure merits issue such as standing, which is more properly addressed in a pre-removal motion to dismiss.  See Johnston Indus., 45 F. Supp. 2d at 1314 ("the court reiterates its finding that a state court motion to dismiss is the proper procedural vehicle through which [Defendant] should pursue its claim that [alleged fraudulently joinded plaintiff] lacks standing").  Despite this, the Court will consider Defendants' fraudulent joinder argument for purposes of completeness.

meritless situations, such as claims plainly barred by the statute of limitations.  See In re Briscoe, 338 F.3d at 223-24 (fraudulent joinder applies to claims barred by statutes of limitation); Roggio v. McElroy, Deutsch, Mulvaney & Carpenter, 415 Fed. Appx. 432, 433 (3d Cir. 2011) (fraudulent joinder applied when lawsuit was barred by absolute litigation privilege). Defendants' argument is much different, focusing on a convoluted question of whether a principal can sue for a fraud allegedly perpetrated upon an agent.  While Defendants cite case law suggesting that a party itself must individually rely on misstatements in order to proceed with a fraud claim, see Kaufman v. i-Stat Corp., 754 A.2d 1188, 1195 (N.J. 2000), Plaintiffs counter with authority stating that, under these circumstances, the only entity that can sue for fraud is PRIAC.  See, e.g., W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP, 549 F.3d 100, 107-09 (2d Cir. 2008) (finding clients, not investment advisors, proper plaintiffs in securities purchase); Restatement (Second) of Agency § 315 ("[a] person who fraudulently . . . enters into a transaction with [] an agent . . . is subject to liability to the principal whether the fraud is practiced on the agent or upon the principal").  Regardless of which party is ultimately correct, the reality is that this standing dispute does not fit within the fraudulent joinder framework.  It is a merits dispute involving conflicting case law, adventurous theories, and a searching analysis.

The simple fact is this:  PRIAC owns more than $20 million worth of securities that are pleaded as part of the many claims in this case.  Given PRIAC's undisputed ownership of a large quantum of securities included in the Complaint, it is impossible to conclude that it is obviously and patently frivolous for PRIAC to be named as Plaintiff in the case.  If anything, the Court's immediate reaction is precisely the opposite, i.e., PRIAC should have standing.  But resolving this question is unnecessary and, in fact, improper in this context.  At best, the parties have a

legal dispute with conflicting authorities.  And the bottom line is that the parties' standing dispute would indisputably cross the line into a merits determination that would undoubtedly require <u>at least</u> as comprehensive an examination as a Rule 12(b)(6) inquiry, which is more than is permitted in the context of fraudulent joinder.  <u>See</u> <u>Batoff</u>, 977 F.2d at 852 (fraudulent joinder analysis less searching than motion for failure to state a claim).  Defendants' challenge to PRIAC's standing is an issue that should have been addressed prior to removal in a motion to dismiss filed in state court, not following removal based on a strained, far-fetched plaintiff-focused theory of fraudulent joinder.  <u>See</u> <u>Johnston Indus.</u>, 45 F. Supp. 2d at 1314 ("the court reiterates its finding that a state court motion to dismiss is the proper procedural vehicle through which [Defendant] should pursue its claim that [alleged fraudulently joined plaintiff] lacks standing").

Based on the above, Defendants have not carried their heavy burden of establishing that PRIAC has been fraudulently joined, and the Court does not have diversity jurisdiction over this case.

## CONCLUSION

For the foregoing reasons, it is respectfully recommended that Plaintiffs' motion to remand be **GRANTED**.


<u>s/Mark Falk</u>_____
**MARK FALK**
**United States Magistrate Judge**


**DATED**:  **January 22, 2013**